UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMIKA KEATHLEY,

           Plaintiff,

v.

GRANGE INSURANCE
COMPANY OF MICHIGAN,

           Defendant.

_____/

Case No. 15-cv-11888

Paul D. Borman
United States District Judge

Mona K. Majzoub
United States Magistrate Judge

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (ECF NO. 74)

This is an insurance loss case involving Plaintiff's claim under a policy of insurance issued by Defendant Grange Insurance Company of Michigan ("Grange") for loss suffered by damage to her home in late January, or early February, 2014, allegedly caused by frozen/burst pipes. While there is no dispute that the Plaintiff's policy with Grange covered a loss caused by frozen/burst pipes, Grange disputes (1) the timeliness of the notice of the loss; (2) Plaintiff's exhibition of the allegedly damaged property to Grange, and (3) Plaintiff's attempt to recover for a mold loss that was allegedly known at the time the coverage bound.

Before the Court for disposition is Grange's Motion for Summary Judgment (ECF No. 74). Plaintiff filed a Response (ECF No. 77) and Grange filed a Reply

(ECF No. 78).  The Court held a hearing on December 21, 2018.  For the reasons that follow the Court GRANTS the motion for summary judgment.

## I.  INTRODUCTION

The essence of the dispute in this insurance loss case is whether Grange suffered material prejudice as a result of Plaintiff's delay in giving notice of the loss. The alleged frozen/burst pipe incident occurred sometime between January 28 and February 2, 2014, but Plaintiff did not file a claim with Grange until April 4, 2014, during which time Plaintiff undertook significant remediation and repair work on the Property herself and largely refurbished the Property.  Between the date of the alleged loss occurrence and the date on which she alerted Grange to the occurrence, Plaintiff in her own words "gutted the house," fully completing remediation and nearly completing all repairs, employing family and friends, and some outside contractors, and paying them almost exclusively in cash, and ultimately submitting a claim to Grange for approximately $132,000, with no invoices, receipts, or documented proof of payment to support the scope of the loss or the necessity of the extensive repairs that she undertook or the amounts that she claims to have paid.  Grange was deprived of any opportunity to investigate the damage in its original condition, to determine the cause of the loss, or to determine the scope of the damage and the necessary repairs. Grange did initially entertain the claim, and began an investigation, but ultimately

denied the claim when it was unable to determine the actual date of occurrence, the actual extent of the damage, or the nature of the repairs undertaken, leaving Grange unable to estimate a loss amount and/or cost to repair. The Court concludes that there is no genuine issue of material fact that Grange suffered significant prejudice as a result of the delayed notice and is entitled to summary judgment.

## II.    FACTUAL BACKGROUND

Viewing the facts in the light most favorable to the Plaintiff, as the Court must when evaluating Defendant's motion for summary judgment, the following story emerges from the testimony of a number of witnesses. Plaintiff purchased the home that is the subject of the loss, 42746 Alba Court, Belleville, Michigan ("the Property") in December, 2013, and was in the process of doing some improvements, but not yet living in the home, on the date of the claimed loss.  (Def.'s Mot. Ex. B, March 31, 2016 Deposition of Timika Keathley 65:1-66:2.)  Plaintiff is employed by General Motors as an assembler but has not been working for some time and has been receiving workman's compensation due to a series of injuries. (Pl.'s Dep. 28:6-36:5.) Plaintiff owns a company named Sincere Investments and for a number of years through that business has been purchasing homes, rehabilitating them, and reselling or renting them.  Plaintiff's ex-boyfriend Michael Green (who was her boyfriend at the time of the claimed loss at issue in this case) owned a company named Mag

Improvements through which Mr. Green rehabilitated homes and resold them. Plaintiff purchased properties through Sincere Investments for Mag Improvement. (Pl.'s Dep. 36:14-40:16.)

Plaintiff bought the Property at issue in this litigation for about $200,000 and intended to eventually live there – she did not intend to flip the Property. (Pl.'s Dep. 46:14-47:21.) Plaintiff purchased the Property in December, 2013, and received a $4,500.00 credit on the purchase after her home inspection revealed a number of issues, including mold throughout the basement. (Pl.'s Dep. 49:7-60:3.) Plaintiff received the keys to the Property on January 10, 2014. (Pl.'s Dep. 65:1-66:2.) On January 28, 2014, Plaintiff received a call from her painter, Eddie Lulaj, whom she had hired to do work on the Property, to inform her that he arrived at the Property to do some painting and found the house cold and the furnace not working. Plaintiff knew that there were problems with the furnace and had called her home warranty company on January 13, 2014, about problems with the furnace. Records received from Plaintiff's home warranty company indicate that Plaintiff also called them on January 31, 2014, to state that the heating unit was out and that water pipes had burst in her basement and were leaking. Plaintiff was informed that burst pipes were not covered by her home warranty. (Pl.'s Dep. 79:21-82:16, 86:12-20, 89:10-23, 93:13-95:7.)

Plaintiff testified that when Mr. Lulaj called to inform her that the house was cold and the furnace was off, she instructed him to turn off the water to the house. (Pl.'s Dep. 97:2-99:11.) Plaintiff called her home warranty company and told them to get someone out for the furnace and was told it would take a couple of days to get the parts. Plaintiff went to the Property the day that Mr. Lulaj called to make sure the house was locked and did not return until the weekend of the Super Bowl, when she and her boyfriend walked in to find water "shooting" out of the faucet in the laundry room and coming out from under the sink "like a fall – a waterfall." (Def.'s Mot. Ex. A, April 29, 2014 Examination Under Oath ("EUO") of Timika Keathley 129:16-21.) Plaintiff's boyfriend ran to the basement to turn off the water, which apparently had not been properly turned off by Mr. Lulaj. (Pl.'s Dep. 100:15-102:24, 105:1-109:3.) After the water had been turned off, she and her boyfriend walked through the house and saw burst pipes "throughout" the house – in the laundry room, kitchen, bathrooms. They finally reached a plumber, "Collin from [C]LA Plumbing," who came that night and "opened up walls" and removed pipes. There was enough standing water that they were able to "push" the water, and they were able to use towels to soak it up. Plaintiff's father and her boyfriend's family members came over to help clean up and carry debris out of the house. Plaintiff did not take any pictures of the standing water and maybe took one picture of a burst pipe before it was

removed from the wall. (Pl.'s Dep. 109:9-132:6.) Plaintiff did attach a number of photographs (many are duplicates) to her Response, many of which depict the basement and most of which, to the extent the images are decipherable, appear to be post-demolition/removal of drywall and floor coverings. (Pl.'s Resp. Exs. 13, 15.)[1]

Plaintiff explained at her EUO that she ordered a dumpster to be delivered to the house the day after they discovered the burst pipes to hold all of the debris that her boyfriend and his helpers were tearing out. Plaintiff's boyfriend and his sons removed wet drywall and flooring, all of the "busted pipes," and other debris, including a jacuzzi tub, and Plaintiff paid them in cash. Plaintiff has no receipts for the cost of the debris removal or the water clean up and dry out but she recalls that her boyfriend brought in a few big fans. (Pl.'s EUO 33:14-38:10, 66:1-72:21, 73:3-75:1, 113:2-9, 118:6-120:12.) Plaintiff also paid cash for the dumpsters, paid cash to the "guys" who laid the travertine floor and installed a glass shower door, and paid cash to the guy

---

[1] Of note, although Plaintiff has accused Grange throughout this litigation of having spoliated photographs that Grange's adjuster (Jason May) took when he visited the Property on May 28, 2014, (this Court denied Plaintiff's motion for spoliation sanctions, ECF No. 69) Plaintiff's counsel, in correspondence dated March 3, 2015, apparently directed to Grange's counsel, states that Mr. May "spent no more than fifteen minutes [at the Property], took no photos and took away no samples of the broken pipes and furnace sections lying about the house." (Pl.'s Resp. Ex. 15, March 3, 3015 Correspondence PgID 5094.) Although the factual dispute regarding whether or not Mr. May took photographs is not material, *see* discussion *infra* at Sec. IVA2, it is interesting to note that Mr. Brouzas, Plaintiff's attorney, at least as of March 3, 2015, believed that Grange's adjuster did not take the allegedly spoliated photographs.

who did work in the basement "filling cracks" – again with no invoice, receipts, or proof of payment. (Pl.'s EUO 120:19-124:12.) Plaintiff testified that she did not intend to file a claim so she was not documenting any of the work – she stated that she is "highly intelligent" and has "many rental properties" and knows enough to take pictures and contact Grange right away if she intended to file a claim. (Pl.'s EUO 124:22-126:8, 145:5-16.) Plaintiff testified that she first sought to have her losses covered under her new home warranty policy. Then, when she determined that her home warranty company was not going to cover the claim, she called her local insurance agent who sold her the Grange policy, Karen Lamerton, within days of the loss, but expressly told her agent that she did not want to file a claim with Grange at that time for fear her premiums would increase and she was going to try to do the work herself. Plaintiff states that Ms. Lamerton told her she had six months to file a claim. (Pl.'s EUO 64:5-23, 124:22-126:8, 146:21-147:12.) As discussed *infra*, Lamerton did not recall making that statement. According to the Plaintiff, she and her boyfriend had "gutted the house," completed demolition, replaced the plumbing, relaid the floors in the bathrooms and began replacing the flooring and cabinets in the kitchen, all before finally contacting Grange on April 4, 2014, to report the loss. (Pl.'s Dep. 107:9-109:3, 133:23-134:25.)

Plaintiff met her hired public adjuster, Margie Banks, while on another job with Ms. Banks and Plaintiff explained what had transpired at the Property. Ms. Banks told Plaintiff she should file a claim with Grange for the repairs undertaken allegedly as a result of the burst pipes. (Pl.'s Dep. 141:18-142:23.) Ms. Banks immediately contacted Joe Tison from RestoJoe to come evaluate the Property and Ms. Banks emailed Grange on April 4, 2014, stating that Plaintiff intended to file a "new" claim for water damage caused by frozen pipes. Ms. Banks stated in the April 4, 2014 email that "mitigation is complete and repairs are almost complete at this time." (Pl.'s Dep. 143:3-144:15.)

Ms. Banks testified in her deposition that she signed a contract with the Plaintiff on March 29, 2014, and brought Joe Tison onto the claim after she filed it with Grange but by that time, all the work had been done. (Pl.'s Resp. Ex. 12, Nov. 19, 2015 Deposition of Margie Banks 56:1-21, 58:25-59:1.) Ms. Banks recalled, and stated in her deposition, that Plaintiff told her that the painter, Mr. Lulaj, had discovered the burst pipes when he entered the home on January 28, 2014, (Banks Dep. 49:14-50:1, 59:13-24, 61:10-17) but both Mr. Lulaj and the Plaintiff recall that Mr. Lulaj discovered the home was cold and the furnace out, but that he saw no damage at that time and that Plaintiff and her boyfriend actually discovered the damage a few days later, specifically on February 2, 2014. Ms. Banks was aware that

Plaintiff was doing work on the home before contacting Ms. Banks and understood that Plaintiff had done drywall repairs, flooring replacements, "quite a bit of stuff." (Banks Dep. 49:1-11, 59:13-60:6.) Ms. Banks prepared an "estimate" of the damage for Grange after she inspected the Property. The "estimate" includes costs for extensive work to every room in the home, including replacement of multiple "missing walls" and a new furnace and water heater, and reports a "net replacement cost" of $132,773.06 for the work done at the Property. (Pl.'s Resp. Ex. 21, Margie Banks's Estimate PgID 5260-91, 5286.) Because demolition was complete and much of the repair work had already been done, Ms. Banks was not able to inspect the original damage, and Plaintiff had no invoices or receipts. As a result, Ms. Banks just measured, took photos, and tried to determine what types of finishes were in place before the loss. (Banks Dep. 77:22-79:16.) It is undisputed that her "estimates" were significantly inaccurate in several respects. For example, Ms. Banks put in an "estimate" for installation of new oak hardwood flooring (including costs for sanding, staining, and finishing) in multiple places in the home when it is undisputed that what was removed from the home was vinyl and carpet and *not* wood. (Margie Banks's Estimate PgID 5263, 5269; Pl.'s EUO 87:1-18.) Ms. Banks submitted a remediation charge for the "dry out" work that was performed by Plaintiff's boyfriend and his sons, reporting a replacement cost equivalent to what a professional remediation

company would charge. Although Ms. Banks had no basis for such a charge as she had no invoices or receipts of payment to Plaintiff's boyfriend and his sons for their "dry out" work, she felt that Plaintiff was entitled to receive what a professional company like Serve-Pro would have charged. (Banks Dep. 86:6-89:23.) Ms. Banks included an amount of $12,590.31 for "demolition" when it is undisputed that there are no receipts or invoices for the demolition work performed by Plaintiff's boyfriend and other friends and family members. (Estimate, PgID 5288.) Ms. Banks estimated an amount for mold remediation based on a Report prepared by Dave Varcoe of Professional Environmental Services, Inc., even though Joe Tison, and not Dave Varcoe, did the mold remediation. (Banks Dep. 93:22-96:24; Pl.'s Resp. Ex. 13, Performance Environmental Services, Inc. "Limited Microbial Assessment" PgID 5068-85.) Ms. Banks testified that she never received an actual invoice from Joe Tison for mold remediation.

Grange assigned Jason May to the Plaintiff's claim. May tried to reach out to the Plaintiff as soon as he was assigned the claim but did not get in touch with Banks or the Plaintiff right away. When he finally got in touch with Ms. Banks, on or about April 9, 2014, she told him that there was a water claim at the home, that there had been burst pipes, that the drying and mitigation was complete and that the repairs were nearly complete, that pipes were repaired, drywall, paint, and carpet had been replaced

and that the Plaintiff was not living in the home. (Pl.'s Resp. Ex. 2, March 22, 2016 Deposition of Jason May 13:1-16:12:9.) On April 30, 2014, May received an email from Ms. Banks submitting certain documentation that May had requested and asking May to meet them at the house soon because the Plaintiff wanted to move in to the Property. (May Dep. 68:24-69:5.)

It is undisputed that May did not visit the Property until May 28, 2014. May testified that because Banks had informed him that all of the mitigation work was complete and repairs were almost complete, May did not see the need to rush out to inspect the Property. Instead, May was seeking documentation from Banks – mitigation documentation, moisture logs, repair invoices, etc. to help document the loss. (May Dep. 21:22-23:2, 39:4-42:7.) May testified that when he visited the Property, the basement had been gutted to the studs, and it appeared that every room in the house had been remodeled or repaired and he was unable to do a damage report because there was no identifiable damage. Mr. May testified that Joe Tison, who was present at the May 28, 2014 inspection, told May that there was no damage to be seen. As part of his review of the claim, May reviewed bills from DTE for the period January 10-May 30, 2014, and saw no spike in usage which he would have expected with the energy drain generally caused by remediation work – running large dry out machines, etc. (May Dep. 96:6-97:6.)

By early June, Plaintiff's claim had been referred to Grange's Special Investigative Unit ("SIU"). Sometime in July, SIU asked May to contact Plaintiff's adjuster to determine if there was still evidence of broken pipes onsite – Banks told May that the pipes had been there when May was there on May 28, 2014, but had since been removed by Joe Tison. (May Dep. 103:5-107:13.)[2]

Ms. Banks testified differently about the condition of the Property when Mr. May came to inspect on May 28, 2014. Ms. Banks is generally critical of Mr. May waiting over a month to inspect the Property and states that most insurance companies

_____

[2] There is undeniably a dispute of fact regarding whether or not there was a "pile" of pipes in the basement when Mr. May came to the Property on May 28, 2014. Ms. Banks, Mr. Tison, and Ms. Fields testify to the presence of broken pipes on the basement floor on that date, and Mr. May testified that he "does not recall" a pile of pipes. In correspondence between Mr. May, Ms. Banks, and Plaintiff in July, 2014, Mr. May asks: "Are the broken pipe sections and furnace parts still available at your home for inspection?" (Pl.'s Resp. Ex. 15, PgID 5128.) Ms. Banks and Ms. Keathley both respond that the pipes were there when Mr. May inspected the Property on May 28, 2014, but had thereafter been discarded. (*Id*. at PgID 5124-29.) Mr. May responds, not denying that the pipes were present when he was there but stating simply: "I also asked that nothing be thrown away until we (Grange Insurance) gave the okay." (*Id*. at PgID 5127.) But, as discussed *infra*, this dispute is not material to the issue of whether Grange was prejudiced by Plaintiff's failure to give Notice to Grange and Plaintiff's related failure to exhibit the damaged property *before* gutting the house, completing mitigation, and largely completing repairs. The presence or absence of a pile of pipes on the basement floor on May 28, 2014, simply has no relevance to the issue of whether Grange suffered prejudice resulting from the undisputed inability to determine through its own investigation when and how those pipes came to be damaged and what collateral damage to the Property was caused by their "busting."

want an adjuster out to the property within 24 hours. Ms. Banks testified that when Mr. May came to inspect the Property, there was still evidence of damage – the kitchen ceiling was open, the basement was in disarray, the kitchen and vanity cabinets that had been removed were still on site, there was still debris in the dumpsters, there were still areas visible under the vanities where the pipes had burst, and there was a pile of pipes in the basement. (Banks Dep. 119:1-126:8.) Ms. Banks testified that Judy Fields, the Van Buren Township inspector who was present when Mr. May came to the Property, told May that when she went by the Property in February, she saw a pile of pipes that the plumber had piled up after he cut them out. Banks also saw the pipes and could tell that they had burst from freezing. (Banks Dep. 131:2-135:5.) Ms. Banks testified that she had taken pictures of the damage that she had sent to Jason May but she was unable to retrieve her photos. (Banks Dep. 135:15-22.) Ms. Banks testified that she provided May with a sketch of the rooms prepared by the plumber indicating the places where the plumber had replaced pipes. (Banks Dep. 112:7-24; Pl.'s Resp. Ex. 9, CLA Heating and Cooling Sketch.) That sketch diagrams 4 (four) "¾ or ½" inch "busted" copper pipes and a valve and two water lines that were replaced under sinks. The sketch does not indicate the scope of work involved in replacing those pipes or the damage that they caused to the surrounding areas. Ms. Banks testified that Mr. May kept asking for dry logs and

moisture mapping but none were done because by the time Joe Tison got to the Property two months after the loss, everything was already dried out and moisture mapping would have been a waste of time. (Banks Dep. 103:6-106:7, 109:22-110:24.) Ms. Banks testified that Mr. May could see the mold growth in the basement and gave the "go-ahead" to Joe Tison to do the mold remediation but to stay within the policy limits. (Banks Dep. 100:20-101:11, 106:8-107:23.)

Joe Tison also was present when May inspected the Property on May 28, 2014, and agrees with Ms. Banks that there was some remaining evidence of damage at the time that was visible to the naked eye. (Def.'s Mot. Ex. C, March 23, 2016 Deposition of Joe Tison 63:22-64:14.) Tison testified that he used three extra large dehumidifiers on Plaintiff's job that ran continuously for six days. Tison admits that generally he prepares estimates in advance of performing his work because some insurance companies won't pay for extra large dehumidifiers "so you have to play a game with the insurance company." (Tison Dep. 8:24-11:3, 12:25-13:25.) He acknowledged that some insurance companies won't pay for dehumidifiers at all without moisture readings but he admits that he did not take any moisture readings at Plaintiff's Property because the drying work "was already underway." (Tison Dep. 29:14-30:5, 11:4-12:5, 14:13-19, 25:24-27:11.) Plaintiff has never paid Tison for the work he did on her Property. (Tison Dep. 24:15-25:9, 31:2-6.) Tison testified that

after water sits for 72 hours it is considered "black water" and the only option is to "strip and rip" which is why he was calling Jason May to say I need to strip and rip and will you ok this. (Tison Dep. 27:13-28:1.) Tison is sure that he took pictures of the pile of pipes in Plaintiff's basement, but he cannot locate any photographs. (Tison Dep. 48:5-49:4, 51:7-19.) Tison has no documentation to support the moisture levels he claims were present in the Property, and although he subbed out the flooring and the painting, he cannot recall to whom he subbed the work and has no documentation to support those costs. (Tison Dep. 38:1-18, 45:1-7.) Tison did his own estimate for his mold remediation work and was not aware that Ms. Banks had prepared a different estimate. (42:7-44:3.) Tison testified that Mr. May gave him approval to do further remediation and specifically to remediate for mold – Tison says he would not have done the mold remediation without May's approval. (Tison Dep. 64:21-65:17.) Tison states that he based his decision to perform "scrubbing" throughout the home utilizing HEPA fans as part of his remediation work based on an oral conversation he would have had with Dave Varcoe, even though Varcoe's Report found normal air ecology on all three levels. (Tison Dep. 33:25-37:19; Pl.'s Resp. Ex. 13, Varcoe Report PgID 5070, 5072.) May left Grange in September, before a decision had been made on Plaintiff's claim. (May Dep. 48:3-51:18, 81:4-10, 103:5-107:13.)

Jeanne Strick is the Grange SIU investigator assigned to investigate Plaintiff's claim. Ms. Strick testified that she is assigned claims that have "red flags" and she is to determine if the red flags suggest any issue with coverage. Her role is to question people, run background checks, work with vendors and experts, interview individuals and to attempt to verify the facts of a claim and make a recommendation regarding coverage – she does not make coverage decisions. (Pl.'s Resp. Ex. 7, Dec. 7, 2015 Deposition of Jeanne Strick 41:22-46:2.) Ms. Strick determined that misrepresentations were made in Plaintiff's estimates and identified during Plaintiff's EUO, through which Plaintiff was attempting to get paid for work that was never performed or costs that were inflated. (Strick Dep. 89:14-92:3.) Ms. Strick concluded that Mr. May acted appropriately in deciding not to immediately visit the Property and rather to collect documentation of the damage done and the work performed because he was informed by Ms. Banks that the mitigation was done and that repairs were almost complete. (Strick Dep. 99:5-12, 103:5-107:8.) Ms. Strick also reviewed water usage numbers from the city that did not support a substantial water loss during the relevant period of the alleged loss. The usage numbers were more reflective of minimal usage in the home consistent with a home that was unoccupied. (Strick Dep. 119:12-122:8, 123:8-124:17, 125:9-15.) Ms. Strick determined that work that Plaintiff undertook on the Property after the alleged frozen pipe incident went far

beyond what was required to "preserve" the Property and prevent further damage. And Plaintiff did not keep any records of the costs of repairs and the estimates prepared by Ms. Banks raised questions of inflated figures and work allegedly performed or materials used that were not done and/or used. Plaintiff claims to have paid out nearly $132,000 in cash out of pocket for repairs and was unable to back any of it up with invoices, receipts, or any records of payment. (Strick Dep. 158:25-167:3.) Ms. Strick admits that Grange did not contact some of the individuals that Plaintiff indicated had performed the work to determine whether in fact they did the work. (Strick Dep. 172:2-177:10.)

## III. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial.

*See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## IV.    ANALYSIS

Grange invokes three separate provisions of the Policy in moving for summary judgment on Plaintiff's claim: (1) the immediate notice of loss provision; (2) the mandatory condition requiring Plaintiff to exhibit the allegedly damaged property to Grange; and (3) the known loss provision with respect to Plaintiff's attempt to recover for mold remediation.

### A.    The Immediate Notice Provision

The Policy contains the following provision on which Grange relies in moving for summary judgment on Plaintiff's claim:

SECTION I – PROPERTY PROTECTION CONDITIONS

1.    What to do in Case of Loss

If a covered loss occurs, the **insured person** must:

a.    give immediate notice to **us** or **our** agent.

(ECF No. 77-1, Pl.'s Resp. Ex. 1, Policy p. 35, PgID 4566.)

Grange contends that the loss occurred sometime between January 18, 2014, and February 4, 2014, and that Plaintiff did not give Grange notice of the loss until April 4, 2014, in violation of the immediate notice provision.  Viewed in the light most favorable to the Plaintiff, the facts demonstrate that the claimed frozen/burst pipe

incident occurred sometime between January 28, 2014 and February 2, 2014.

Plaintiff testified that she called her insurance agent, Karen Lamerton, within a week of the incident and after she had learned that her home warranty company would not cover burst pipes, to explain that she had suffered water damage from frozen/burst pipes. (Pl.'s Dep. 140:3-15.) Ms. Lamerton recalled that Plaintiff called her sometime in January regarding a frozen pipe incident and thought that she had made a log entry reflecting the January contact but could not find an entry, although she did clearly recall that Plaintiff called around that time and explained the incident. (Def.'s Mot. Ex. G, Jan. 22, 2016 Deposition of Karen Lamerton 27:13-17, 28:14-30:4.) Plaintiff told Lamerton that she did not want to file a claim with Grange at that time because she was going to explore other coverages or try to do the work herself. (Lamerton Dep. 27:18-28:3.) Plaintiff testified that Lamerton told her that she (Plaintiff) had six months to file a claim. (Pl.'s Dep. 140:18-19.) Lamerton has no recollection of making this statement to Plaintiff but did recall that she told Plaintiff to retain all documentation and to preserve all physical evidence of damage, and to take videos and photographs of the damage if she intended to file claim. (Lamerton Dep. 28:2-9, 32:21-33:3, 49:6-19.) It is undisputed that Ms. Lamerton followed Plaintiff's directive and did not contact Grange to notify them of the Plaintiff's call and did not make a note of the call in her files.

Although Ms. Lamerton did not document the date of the call from Plaintiff, other evidence confirms it likely occurred some time between January 28, 2014 and February 2, 2014. Plaintiff's painter, Eddie Lulaj, signed a letter that was drafted for his signature by the Plaintiff sometime after she filed her claim with Grange, which stated that he entered the Property on January 28, 2014, and noticed the house was very cold. (Lulaj Dep. 42:11-17; Pl.'s Resp. Ex. 10, April 10, 2014 Letter, PgID 4895.) Lulaj testified that he could not be certain about the exact date because he was signing this letter three months after the fact and Plaintiff had drafted the letter for him and had put in that date. (Lulaj Dep. at 42:2-15.) But he was certain about the fact that he entered the house, it was very cold, and he called the Plaintiff and told her that the house was cold and the furnace was out. Plaintiff instructed him to turn off the water which he did. He did not notice any damage to the house at that time. (*Id*. at 42:16-48:5.) Lulaj testified that he returned to the Property maybe a week or more later and he then witnessed a lot of damage to the walls which were cut out to replace busted pipes and to the floors – faucets were broken in the laundry room and upstairs bathrooms, and there were many open holes in the walls. (*Id*. at 48:6-51:12.)

Also supporting the January 28 - February 2, 2014 time frame, Plaintiff's home warranty company produced log notes indicating that they received a call from Plaintiff on January 28, 2014, stating that the furnace was out. Plaintiff believes that

this is the day that Mr. Lulaj called her to tell her the house was cold and the furnace was out. Plaintiff testified that it was going to take a few days to get the parts and the furnace was not repaired on that date. (Pl.'s Dep. 83:5-84:14.) Further log notes from the home warranty company suggest that Plaintiff called them on January 31, 2014, stating that there was damage from frozen/burst pipes and asking about coverage. (Pl.'s Dep. 93:13-95:7.)

Plaintiff testified that she and her boyfriend discovered the loss on or about February 2, 2014, because Plaintiff remembers it was around the date of the Super Bowl, which occurred on February 2nd in 2014. She cannot pinpoint the exact date but recalled that it would have been the day she called the plumber because he came that day and began tearing out pipes. (Pl.'s Dep. 102:13-103:17.)

Thus the parties are generally in agreement as to the basic time frame of the alleged occurrence of the frozen/burst pipe incident. What is in dispute is whether Plaintiff's call to her agent in January 2014, telling her about the frozen/burst pipe incident, was notice of a covered loss under the Policy to Grange and, if not, whether notice on April 4, 2014, satisfied the "immediate notice" provision of the Policy.

### 1. Informing Plaintiff's insurance agent of the occurrence in January, 2014 was not notice to Grange.

It is undisputed that Plaintiff instructed Ms. Lamerton, when she contacted her in or about late January, 2014, *not* to file a claim with Grange. It is also undisputed

that on April 4, 2014, Plaintiff's public adjuster Margie Banks sent an e-mail to Grange informing Grange that Plaintiff was filing a "new" claim for a January, 2014 loss caused by burst pipes. There is no evidence that either Ms. Banks or the Plaintiff made any reference to or mention of a January, 2014 phone call by the Plaintiff to Ms. Lamerton when submitting this "new" claim to Grange in April, 2014.

Nonetheless, Plaintiff now argues that her phone call to Ms. Lamerton in or about late January, 2014, was sufficient notice to Grange of the alleged loss. Grange argues that the call to Ms. Lamerton in January, 2014, in which it is undisputed that Plaintiff instructed Ms. Lamerton *not* to file a claim on her behalf, and informing Ms. Lamerton that Plaintiff wanted to try to do the work herself without filing a claim, cannot serve as notice to Grange.[3]

---

[3] At oral argument on the motion for summary judgment, Plaintiff for the first time raised an argument suggesting that Grange should be bound by Ms. Strick's response to questioning at her deposition as to whether Plaintiff satisfied the immediate notice provision of the Policy through her January, 2014 phone call to Ms. Lamerton. (Strick Dep. 168:8-17.)  This brief question and answer reference gives no indication that Ms. Strick was aware of the context of that January 2014 phone call, in which Plaintiff expressly instructed Ms. Lamerton NOT to notify Grange and not to file a claim with Grange, or how such a directive would have affected Ms. Strick's response to the question posed.  In any event, the Court declines to consider this hastily and belatedly raised argument. *Roberts v. Principi*, 283 F. App,x 325, 332 n. 3 (6th Cir. 2008) ("Because counsel raised the issue only at oral argument, however, we decline to review it."); *Lane v. LaFollette, Tenn.*, 490 F.3d 410, 420 (6th Cir. 2007) (issue waived by first raising it at oral argument); *Lafata v. Dearborn Heights Sch. Dist. No. 7*, No. 13-CV-10755, 2013 WL 6500068, at *8 (E.D. Mich. Dec. 11, 2013) ("Generally, courts will not consider theories or arguments raised for the first time at

The parties devoted little analysis to this argument in their briefing, but the evidence suggests that Ms. Lamerton's agency, Insurance Agency One, Inc., ("Insurance One") is an authorized insurance agent of Grange for certain purposes. (Pl.'s Resp. Ex. 19, Michigan Agency Agreement between Grange and Insurance One.) "Notice of loss to an *authorized* insurance agent of the insurer as to a matter *within* the scope of his authority is chargeable to an insurer." *First Mercury Ins. Co. v. Christopher K Corp.*, No. 09-cv-14918, 2011 WL 3497294, at *5 (E.D. Mich. Aug. 10, 2011) (citing *Wendel v. Swanberg*, 384 Mich. 468, 479 & n. 7 (1971)) (emphasis in original). Plaintiff argues that Ms. Lamerton, as an agent of Insurance One, was authorized to "solicit insurance for a commission, bind insurance contracts, '[p]rovide all the usual and customary services of an insurance agent on all insurance contracts placed by the Agency with [Grange],' and collect and receive premiums from the insured." (Pl.'s Resp. 10, PgID 4506.) None of this quoted language suggests that Ms. Lamerton "was authorized or selected to receive notice of insurance claims on behalf of [Grange] or investigate any claim losses." *First Mercury*, 2011 WL

---

oral argument."); *Probst v. Central Ohio Youth Ctr.*, 511 F. Supp. 2d 862, 871 (S.D. Ohio 2007) ("It is well established that a moving party may not raise an issue for the first time in its reply brief or at oral argument."); *Van Sickle v. Automatic Data Processing, Inc.*, 952 F. Supp. 1213, 1221 (E.D. Mich. 1997) (declining to consider issued raised for first time at oral argument when opposing party was deprived of opportunity to respond).

3497294, at *6.  In any event, it is undisputed that Ms. Lamerton was instructed by Plaintiff in the January 2014 phone call not to file a claim on her behalf and Ms. Lamerton did not report a claim to Grange or otherwise notify Grange of the occurrence reported by the Plaintiff.  Ms. Lamerton's knowledge, even if imputed to Grange, was that Plaintiff was *not* giving notice of a covered loss and was *not* intending to file a claim.  "Because [Grange] can only be imputed with the knowledge [] which [Lamerton] received during the scope of [her] authority[,]" Grange cannot be charged on these facts with notice that Plaintiff was seeking to file a claim for a covered loss.  *Id.*  Here, Ms. Lamerton specifically received notice of *no* claim, knowledge which, if imputed to Grange, is just that: *not notice* of a claim or notice of *no claim*.  What does Plaintiff propose Grange could have done with such knowledge – arrive at the Property to investigate an occurrence for which a claim had not been filed? Finding notice sufficient under such circumstances would undermine the very purpose of the immediate notice provision, which is to give the insurer the opportunity to promptly investigate and evaluate a claim.  Where no claim is being made and the insurer is not in fact apprised of the occurrence, any "notice" given to an agent is necessarily "not notice" to the insurer to begin the investigative process.

Perhaps the most telling evidence that the January 2014 phone call to Ms. Lamerton was *not* notice to Grange under the policy is the fact that Ms. Banks,

Plaintiff's experienced public adjuster, expressly denoted the ultimate frozen pipe claim as a "new claim" in her April 4, 2014 Email to Grange, and made no mention of the January 2014 contact between Plaintiff and Ms. Lamerton. "Obviously, the plaintiff [and her public adjuster] knew that notice to [Ms. Lamerton] was insufficient to provide notice to the insurer[]." *Steelcase, Inc. v. American Motorists Ins. Co*., No. G87-553, 1989 WL 253892, at *9 (W.D. Mich. Feb. 24, 1989), *aff'd Steelcase, Inc. v. American Motorists Ins. Co*., 907 F.2d 151 (6th Cir. 1990) (table case).

The Court concludes that Plaintiff's call to Ms. Lamerton in January, 2014, informing her of the incident, but instructing her explicitly to not report the loss to Grange and not to file a claim on her behalf, was *not* notice to Grange of a covered loss under the Policy.

## 2. Notice to Grange on April 4, 2014, after demolition and remediation were complete and repairs to the Property were almost complete, materially prejudiced Grange's ability to investigate the claim and estimate the damage.

As discussed *supra*, on April 4, 2014, Plaintiff's public adjuster Margie Banks sent an email to Grange to "file a new claim on behalf of Ms. Timika Keathley," for the Property located at "42746 Alba Ct., Van Buren Twp., MI 48111." (ECF No. 74-6, Def.'s Mot. Ex. E, April 4, 2014 Email from Margie Banks to Loss Rept, PgID 4240.) The email states as follows:

On January 28th, 2014, Mrs. Keathley received a phone call from her

painter that when he arrived at the home to paint he found water damage through out caused by frozen pipes.  The furnace has stopped working for a period of time possibly caused by a temporary power outage in the area during a winter storm.

Mrs. Keathley originally tried to claim damages under her home warranty program as she had just purchased the home.  The home warranty company is not going to cover the claim.

Mitigation is complete and repairs are almost complete at this time.  Mrs. Keathley has documented the damages with photos.

The contact info for this claim is: Margie Banks - Public Adjuster - 586-329-0118.  A copy of our contract is attached to this email.

(4/4/14 New Claim Email, PgID 4240.)

Putting aside for the moment the discrepancy created by this email regarding who discovered the loss and when (Plaintiff and her painter testified that he discovered the Property to be cold and the furnace out but observed no damage when he called the Plaintiff to alert her to the cold temperature in the home and Plaintiff testified that she and her boyfriend discovered the loss almost a week later, around Super Bowl Sunday) Grange argues that notice two months after the occurrence of the alleged loss violated the immediate notice provision under the circumstances of this case. "'Provisions in liability insurance contracts requiring the insured to give the insurer immediate or prompt notice of accident or suit are common, if not universal.'" *Triple Inv. Grp, LLC v. Hartford Steam Boiler Inspection and Ins. Co.*, 71 F. Supp. 3d 733, 739 (E.D. Mich. 2014) (quoting *Wendel v. Swanberg*, 384 Mich. 468, 477,

27

(1971)).  The terms "immediate" and "prompt" and similar terms have been construed

to require a "reasonable time" under the facts of the case:

> Prompt notice has "generally been construed to mean within a reasonable time under the circumstances of the case." 13 Couch on Ins. § 190:31 (2014); *see also* Dkt. No. 53 at 17–18 (citing *Burgess v. American Fidelity Fire Ins. Co.*, 107 Mich. App. 625, 628, 310 N.W.2d 23, 25 (1981), and *Kennedy v. Dashner*, 319 Mich. 491, 493–94, 30 N.W.2d 46, 47 (1947), to note that "Michigan law construes policy language requiring the insured to give notice 'immediately' or 'as soon as practicable' as requiring notice 'within a reasonable time.'").

*Hartford Steam*, 71 F. Supp. 3d at 739.

The immediate notice provision is intended to give the insurer adequate time

to investigate and prepare a defense, and thus an insurer must demonstrate that the late

notice prejudiced the insurer's ability to investigate and prepare a defense:

> The Sixth Circuit has found that, "[u]nder Michigan law, late notice to an insurance company will not eliminate an insurer's obligations under a policy unless the insurer can demonstrate that it has been prejudiced by the delay." *West Bay Exploration Co. v. AIG Specialty Agencies of Texas, Inc.*, 915 F.2d 1030, 1036 (6th Cir. 1990) (citing Michigan cases). Michigan courts have required insurers to demonstrate prejudice due to the purpose of insurance notice provisions. *See id.* at 1036 n. 8. According to the Michigan Supreme Court, the purpose of notice provisions is "to give the insurer an opportunity to investigate the facts and circumstances affecting the question of liability and the extent of such liability." *Wehner v. Foster*, 331 Mich. 113, 119, 49 N.W.2d 87, 90 (1951); see also *Wendel*, 384 Mich. at 477, 185 N.W.2d at 352 (stating that notice provisions "allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims.").

*Hartford Steam*, 71 F. Supp. 3d at 739-40.

"Since the purpose of insurance notice provisions are to provide an insurer an opportunity to investigate and evaluate claims to defend against unsound ones, it follows that prejudice will be found if the insurer demonstrates that a delay in providing notice materially impaired the insurer's ability to contest its liability to an insured." *Id*. at 740. "[T]he burden of demonstrating prejudice rests upon the insurer." *Id*. "An insurer must do more than simply claim that evidence was lost, physically altered, or has otherwise become unavailable and that witnesses have died, disappeared, or their memories have faded. Instead, an insurer must establish what is in fact lost by the missing evidence, how this prejudices its position, and why information available from other sources is inadequate." *Id*. (internal quotation marks and citations omitted). "The question of prejudice is generally to be left to the trier of fact. However, where the facts are so clear that one conclusion only is reasonably possible, the question is one of law." *Id*. (internal quotation marks and citations omitted). "In determining whether an insurer's position has actually been prejudiced by the insured's untimely notice, courts consider whether the delay has materially impaired the insurer's ability: (1) to investigate liability and damage issues so as to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (5) to contest its liability to its insured." *Id*.

In this case, Grange was materially prejudiced by its inability to "investigate liability and damage so as to protect its interests," and was specifically prejudiced by its inability to evaluate the damage in its original state, to determine the necessary repairs and to negotiate with contractors for the repairs it might have deemed necessary, and to contest its liability to the insured. While there are several disputed facts regarding the actual condition of the Property when Mr. May did decide to inspect the Property on May 28, 2014, these disputes are not material to the issue of prejudice in this case. May testified that the entire home was completely remodeled, that there was no evidence of any damage, that there were no burst pipes for him to inspect, and there was no damage to estimate. But Margie Banks, Joe Tison, and the Plaintiff, each of whom was present when May inspected the Property on May 28, 2014, testified that there were several areas where broken pipes had been removed still evident that day, that Joe Tison had collected the broken pipes in a pile in the basement expressly for May's inspection, that the kitchen ceiling was open and he would have been able to inspect the water damage in that location, the kitchen cabinets had not been installed, and the bathroom walls were open. In addition, Plaintiff argues, Grange opted not to speak with any of the individuals who actually performed the repairs, such as the plumber who actual prepared a schematic drawing indicating where he had replaced the broken pipes. (Pl.'s Resp. Ex. 9.) Plaintiff

argues that she gave Grange the contact information, phone numbers, and detail regarding the work performed by several individuals, and Grange elected not to contact any of them. But an insurer does not have to rely on the investigative reports of third parties as a substitute for conducting their own investigation:

> An investigation of the storage tank conducted by a third party hired by Steelcase was insufficient to protect appellees from prejudice in their defense against Steelcase's claim. Whatever the quality of the report of the independent testing company that examined the tanks shortly after the leak, appellees could not have the same confidence in it that they would have in the results of their own investigation. Nor could they be certain that the independent tester investigated with the same motivations and the same attention to possibly exculpatory details. The purpose of an insurance policy notice provision is "to allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent or excessive claims." *Wendel*, 384 Mich. at 477, 185 N.W.2d at 352. That purpose was subverted by the delay in giving notice of the leak. An investigation by an independent agent is a poor substitute. Although the Michigan courts have faulted insurers for failing to investigate an accident after delayed notice where relevant information could still be obtained, we do not believe that they would find a failure to show prejudice where an insurer had no way to conduct its own investigation on a matter of relevance to its defense. Even if a jury were to conclude that the independent tests authorized by Steelcase were accurate and reliable, that would not change our conclusion that AMICO and GNIC were prejudiced by the inability to conduct their own investigations.

*Steelcase, Inc. v. American Motorists Ins. Co.*, 907 F.2d 151, at *3 (6th Cir. 1990) (table case). In *Steelcase*, as here, the insured notified its insurance broker within days of discovering the loss (a leak of 3,000 gallons of paint solvent from an underground storage tank) but decided not to notify the insurer or file a claim with the insurer at

that time, "hoping that cleanup costs would be minimal and desiring to avoid increased premiums." *Id*. at *1.

By the time that Steelcase did give notice of the occurrence, the tank that held the paint solvent had been destroyed, and an examination of that tank was deemed essential to the insurer's defense. *Id*. at *2. In addition, the insurer was completely unable to participate in decisions related to remediation as the insured "hired consultants and developed a clean-up plan that cost hundreds of thousands of dollars before notifying the insurer of the leak." *Id*. The delay also deprived the insurer of investigating whether it had viable claims against any third-parties. *Id*. The Sixth Circuit upheld the district court's summary judgment rulings that, as a matter of law, (1) notice to the insured's insurance agent within days of discovering leak was *not* notice to the insurers, and (2) the insurers suffered material prejudice as a result of the insured's delay in giving notice of the occurrence and intent to file a claim. *Id*. at *6-7.

In *Hankins v. Fremont*, No. 317358, 2014 WL 6853106 (Mich. Ct. App. Dec. 4, 2014), an unpublished *per curiam* decision, the Michigan Court of Appeals analyzed a factually similar scenario that merits mention here. In *Hankins*, the plaintiff claimed significant damage to his home as the result of a burst water pipe in his basement, but waited two months to inform his insurance company of the damage.

The insurance company denied the claim, asserting prejudice due to the delay in receiving notice of the claim because, during the delay, the plaintiff "hired a workman to repair the pipe and to conduct extensive repairs and remodeling to the house," and the workman had disposed of the evidence of the damage and the repairs. *Id*. at *2. Noting that the burden is on the insurer to establish material prejudice, the Michigan Court of Appeals found such prejudice was established by the fact that plaintiff undertook the repairs before contacting the insurer:

> [D]efendant was significantly prejudiced by plaintiff's delay. Defendant was unable to determine through its own investigation whether the pipe had burst consistent with coverage, what caused the burst, the extent and scope of damage, whether the repairs were necessary, and whether less extensive repairs would have sufficed. Plaintiff's actions effectively prevented defendant from conducting its own investigation of the incident and the resulting damage.
>
> Plaintiff, however, contends that defendant could have obtained information about the damage from him or the workman, whom plaintiff knew before the incident, and invoices. Yet, plaintiff fails to explain how defendant could have protected its interest and challenged the insurance claim as fraudulent, invalid, or excessive when defendant was entirely restricted to the version of events plaintiff and his workman advanced. *Tenneco Inc. [v. Amerisure Mut. Ins. Co.]*, 281 Mich. App [429] at 447 [(2008)]. Because of plaintiff's delay, defendant was unable "to investigate liability and damage issues so as to protect its interests," "to evaluate, negotiate, defend, or settle a claim or suit," or "to contest its liability to its insured." *Id*. at 448–449 (quotation marks and citation omitted).

2014 WL 6853106, at *2.

Grange faced the same situation here. It is undisputed that Grange was unable

to inspect the Property in its original damaged condition, was unable to determine through its own investigation the cause or scope of the damage, and was deprived of the opportunity to decide what repairs were necessary and was unable to negotiate with contractors to perform those repairs. It is undisputed that all demolition and remediation was done before Plaintiff filed a claim with Grange on April 4, 2014, that all debris (save some broken pipes) had been discarded in an outdoor dumpster, and that almost all repair work was complete or well underway. Plaintiff argues that Grange should have been able to work off of Ms. Banks "estimate," but the acknowledged significant inaccuracies in her "estimate" only highlight the material prejudice that Grange had already suffered by the time it was given notice of the loss. Ms. Banks defended her inaccurate "estimate" as just an estimate – "a starting point" for negotiations with the insurance company about what they were prepared to approve and cover – and she admits that she was hampered in preparing the estimate because she had no idea what the condition of the Property was, or what finishes were in place prior to the loss, and had to do a fair amount of guessing – as Grange would be required to do in preparing any competing estimate. (Banks Dep. 84:9-21.) In fact, presenting "estimates," rather than invoices, for work that is already complete is an oddity in and of itself. Given that nearly all of the work had already been completed on the Property at this point, Ms. Banks should have been able to present invoices for

work completed and proof of payment – not "estimates" of what it would cost to repair the damage that had already been remediated and repaired. Ms. Banks testified to her understanding that an invoice is an actual cost for work that is already complete and an estimate is just an estimate – a starting point for negotiating with the insurance company that has the ability to do its own estimate of the damage. (Banks Dep. 92:24-93:15.) But Grange was deprived of that ability here.

Ms. Banks views her role as a public adjuster as helping the insured – apparently including seeking to recover for work that was never performed and materials that were never used – and believes that it is up to Grange "to actually determine what the damages are and prepare an estimate." (Banks Dep. 90:16-20.) But this only demonstrates the irreversible prejudice to Grange caused by Plaintiff's decision not to report the loss and to undertake all of the work herself (and to pay for that work in cash and fail to keep invoices or receipts) before even contacting Grange. At that point, there was no original damage for Grange to inspect – only piles of torn out pipes and a handful of poor-resolution photographs. How could Grange possibly determine after the fact whether it would have concluded that entire rooms were in need of new drywall and flooring, among other extensive repairs that Plaintiff undertook? Plaintiff testified that she paid $200,000.00 for the Property, and seeks damages from Grange of approximately $130,000 – over half the value of the

Property. Grange was deprived of any opportunity to examine the damages to the Property in their original state, and completely unable to determine the scope of the work necessary to complete any repairs. In this case, the insured undertook all demolition, mitigation, and extensive repairs and only then notified Grange of the loss and presented Grange with an estimate unsupported by any invoices or receipts or proof of payment which also contained significant misrepresentations of losses, expecting Grange to take her word for it and pay up. Grange's inability to inspect the Property prior to demolition, remediation and repairs prejudiced its ability to investigate, estimate, and resolve Plaintiff's claim. Granted, viewing the facts in the light most favorable to the Plaintiff, Grange could have, many months after the incident, inspected a pile of removed broken pipes in the basement, maybe could have sorted through debris in a dumpster, could have looked at a handful of photographs, and could have sought out various individuals who are alleged to have performed the work for cash.[4] But none of this evidence could adequately answer the key threshold

---

[4] It is significant that Plaintiff did not endeavor to depose any of these individuals, and did not offer affidavits from these individuals to oppose Grange's motion for summary judgment. While Grange has the burden to prove prejudice, Plaintiff also had the burden under Fed. R. Civ. P. 56 to meet Grange's motion with facts of evidentiary quality establishing genuine issues of material fact for trial. In any event, Grange "could not have the same confidence in [such testimony] that they would have in the results of their own investigation. Nor could they be certain that [these individuals acted] with the same motivations and the same attention to possibly exculpatory details." *Steelcase*, 907 F.2d 151, at *3.

questions of what actually caused the claimed damage, how extensive that damage was, what work was actually necessary to repair the damage, and whether Grange would have approved the extensive remodel that Plaintiff undertook on her own and would have paid the same price for the repairs.

While prejudice to the insurer caused by delay in providing notice is generally a question for the trier fact, on these facts reasonable minds could not differ in finding that the delay in this case, and more specifically the work completed during that delay by the Plaintiff before giving notice to Grange (performing all water and mold remediation, tearing out allegedly impacted drywall and floors and disposing of these items in an outside dumpster, and undertaking extensive repairs to the Property), prejudiced Grange's ability to investigate the facts and circumstances of the alleged loss and to determine the scope of the loss and the extent of Grange's liability. As United States District Judge Richard Enslen concluded in *Steelcase*, *supra*:

> The delay involved in this case was unreasonable because [Plaintiff] knew of the incident and of the possibility that insurance coverage was available immediately after the [incident] occurred. [Plaintiff] delayed notice for the sole purpose of advancing [her] own financial interests. The delay prejudiced the insurer[] because it prevented [Grange] from conducting a contemporaneous investigation of the incident and from participating in [Plaintiff's] decision to adopt particular [remediation and repair] procedures.

1989 WL 253892, at *12 (alterations added). Plaintiff's failure to give timely notice in this case materially prejudiced Grange. Plaintiff's failure to comply with this

condition precedent to coverage under the Policy entitles Grange to summary judgment.

**B.    Plaintiff Breached the Policy Provision Requiring the Insured to Exhibit the Damaged Property**

Grange also asserts that Plaintiff breached the Policy provision requiring the insured to exhibit the damaged property to Grange:

1.    What to do in Case of Loss

If a covered loss occurs, the **insured person** must:

e.    exhibit the damaged property to **us** or **our** representatives, as often as my be reasonably required.

(ECF No. 77-1, Pl.'s Resp. Ex. 1, Policy p. 35, PgID 4566.)

Grange observes that this provision "works in tandem with the notice provision," and Grange merely incorporates its arguments made with respect to the notice provision.  (Def.'s Mot. 18, PgID 3743.)  Plaintiff gives little attention to this provision in her Response, stating only that Grange "did not want to inspect plaintiff's damaged home as its corporate representative Jeanne Strick wrongly believed that Grange did not have to do so because the repairs already had been completed."  (Pl.'s Resp. 33, PgID 4529.)  First of all, there is no evidence in this record that Ms. Strick was even aware of or involved in the claim when Mr. May made the decision to hold off on inspecting the Property until May 28, 2014.  In any event, Grange (Mr. May)

38

was only relying on Ms. Banks's April 4, 2014 email, which expressly stated that remediation was complete and repairs were almost complete. Plaintiff has presented no evidence on which a reasonable juror could conclude that had Mr. May gone to the Property sooner, there would have been additional physical evidence of the damaged property in its original condition to inspect that was not present on May 28, 2014. Indeed, it is undisputed that demolition of the drywall, flooring, cabinets, and plumbing was complete long before Plaintiff notified Grange of the loss. Along with that demolition went Grange's ability to inspect the damaged Property in its original damaged condition.

In addition, it is undisputed that extensive repairs had already been done when Ms. Banks was asking Mr. May to come and inspect the Property. No reasonable juror could conclude that had Mr. May come to the Property sooner, Plaintiff would have "exhibited" the damaged Property in its original damaged condition. Plaintiff did not preserve physical evidence of the damage (save for a pile of pipes and a dumpster full of debris) and did not keep documentation of the work performed or the payments made – indeed Plaintiff testified that she intentionally *did not* document the "gutting" of the Property, or the remediation and repairs, and disposed of the majority of the physical debris in a dumpster because she had no intention of filing a claim.

Viewing the facts in the light most favorable to the Plaintiff, the evidence demonstrates that at the time Plaintiff gave notice to Grange, there was a pile of burst pipes on the basement floor, along with a damaged furnace, an open hole in the kitchen ceiling, debris (presumably the "guts" of the Property) in the dumpster, and some photographs (mostly post-demolition). This is not "exhibiting the damaged property" – this is exhibiting portions of what Plaintiff tore out and replaced before Grange had the opportunity to see the damaged Property in its original condition. In fact Plaintiff's own testimony establishes that she had no intention of making a claim when she undertook remediation and repairs – she wanted to complete the work on her own and avoid an increase in her premiums – until she was encouraged by Ms. Banks to file a claim.

Plaintiff suggests that the Policy required her to do what was necessary to preserve the Property – but her own testimony establishes that she was trying to do the repair and remodel herself for financial reasons, not merely attempting to "preserve the Property" for Grange's benefit, when she completed demolition, remediated the water damage, and made extensive repairs, paying for it all in cash, long before she notified Grange of the occurrence. There was no way for Grange to "travel back in time and determine what [the Property] looked like at the time of the [occurrence]." *Steelcase*, 1989 WL 253892, at *10. And the evidence that *was* available to Grange

once it was given notice was "clearly inadequate to compensate for [Grange's] inability to contemporaneously investigate the incident." *Id*. Plaintiff failed to satisfy the Policy provision requiring that she "exhibit the damaged property," a condition precedent to coverage under the Policy, entitling Grange to summary judgment.

C.     **The Policy's Known Loss Provision Excludes Coverage for Damage Resulting From Mold Throughout the Basement of Which Plaintiff Was Aware at the Time Coverage Was Bound**

The Policy provides as follows:

SECTION I - PROPERTY PROTECTION AND SECTION II - PERSONAL LIABILITY PROTECTION CONDITIONS

8.     Known Loss

We do not provide coverage for any loss or occurrence which was known to any insured person and occurred prior to the time you signed the application for coverage, or asked us or our agent to provide coverage, even if the loss or occurrence falls within the period covered by the policy.

(Pl.'s Resp. Ex. 1, Policy p. 48, PgID 4579.)

"'The known loss doctrine is a common law concept that derives from the fundamental requirement of fortuity in insurance law. Its basic premise is that insurance policies are intended to protect insureds against risks of loss; not losses that have already taken place or are substantially certain to occur. Accordingly, the doctrine is properly invoked when the insured 'knows' about the claimed loss before the policy is purchased.'" *Lower Town Project, LLC v. Lawyers Title Ins. Co*., 2011

WL 3319710, at *14 (E.D. Mich. Aug. 1, 2011) (quoting *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 10 F. Supp. 2d 771, 789 (E.D. Mich.1998)). "'Courts have held that the known loss doctrine must be 'judged using a subjective standard' because requiring this 'knowledge element best serves the overall principle of insurance.'" (quoting *Aetna*, 10 F. Supp. 2d at 789.) "The crucial analysis, then, is whether the insured 'was aware, at a minimum, of an immediate threat of [the risk of loss] for which it was ultimately held responsible and for which it now seeks coverage.'" (quoting *Aetna*, 10 F. Supp. 2d at 789) (alteration in original).

Grange relies on the inspection report that Plaintiff obtained from Pillar to Post in connection with the purchase of her home in December, 2013, which stated in capital letters: MOLD ABATEMENT NEEDED THROUGHOUT BASEMENT AREAS. ALL MOLD ABATEMENT MUST BE DONE IN ACCORDANCE WITH EPA PROTOCOLS FOR OCCUPANTS HEALTH AND SAFETY. (Def.'s Mot. Ex. H, June 28, 2016 Declaration of Matt Dalfino, Ex. A, October 3, 2013 Home Inspection Report conducted at the Property, p. 51, PgID 4473.) The testimony is undisputed that no formal mold abatement was conducted on the Property prior to the frozen/burst pipe incident in late January or early February 2014. Because Plaintiff was aware of this condition, the mold constitutes a loss about which Plaintiff was

aware at the time she signed the Policy.[5]

Plaintiff admits an awareness of the mold problem but argues in response that the prior owner took care of the "mold" problem in the basement bathroom and around the sump pump before closing by either spraying on "Kilz" or painting over it when her Home Inspection Report clearly required professional abatement. (Pl.'s Dep. 78:12-79:16.) But the Pillar to Post report expressly directed that the mold problem to which the inspector was referring was "throughout the basement," and had to be abated in accordance with EPA protocols. In fact, Plaintiff obtained a significant price reduction for the purpose, among other things, of conducting the abatement. It is undisputed that Plaintiff never undertook to abate the mold problem throughout the basement. No reasonable juror could conclude that Plaintiff reasonably believed that the prior owner addressed the mold problem in the basement by painting over it or spraying some "Kilz" on it. Even assuming that Plaintiff had given adequate notice, and that Grange would not be entitled to summary judgment on her claims, Plaintiff would be precluded from recovering any damages related to mold abatement because the presence of mold throughout the basement," which Plaintiff was informed through

---

[5] Although Dave Varcoe's Report does find the presence of mold in the basement of the Property, nothing in that Report purports to determine how long the mold had been present or to distinguish any "new" mold from the preexisting mold found on Plaintiff's Home Inspection Report. (Pl.'s Resp. Ex. 13.)

her Home Inspection Report required professional abatement in accordance with EPA protocols, was known to Plaintiff at the time that Plaintiff secured the Policy with Grange.

### D.     Plaintiff is Not Entitled to Recovery of Attorney's Fees

Grange argues that Michigan law "unequivocally precludes an insured from recovering attorney fees as an element of damages against an insurer for breach of contract." (Def.'s Mot. 20, PgID 3745) (citing *Shathaia v. Travelers Cas. Ins. Co. of Am.*, 984 F. Supp. 2d 714, 728 (2013) (Duggan, J.). Plaintiff's counsel conceded at the hearing on Defendant's motion that he is not entitled to seek attorneys' fees. Thus, Grange would be entitled to summary judgment on Plaintiff's claim for attorneys' fees even were the Plaintiff's claim to proceed to trial.

## V.     CONCLUSION

Before giving notice to Grange of the occurrence, Plaintiff "gutted" the home and deposited most of the debris in a dumpster in her driveway in the middle of winter, preserving at most a pile of busted pipes for Grange to inspect, along with some photographs, as evidence in support of a claimed outlay of over $132,000 in cash (unsupported by invoices, receipts, or proof of payment) to demolish, remediate, and repair alleged damage to the Property. The delay in notice, and the work performed prior to finally giving notice, deprived Grange of any ability to investigate

the cause of the extensive damage Plaintiff reported, to determine for itself the scope of the damage and the necessary repairs, or to select and negotiate with contractors to perform the work that it may have concluded (after its investigation) was necessary. Material prejudice is patent here and no reasonable juror could conclude otherwise.

Accordingly, the Court GRANTS Grange's motion for summary judgment.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: February 4, 2019